**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:13-CR-171-AT-AJB** |
| **MICHAEL ALAN PECK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES MAGISTRATE JUDGE'S
<u>FINAL REPORT AND RECOMMENDATION</u>**

Before the Court are two pretrial motions filed by Defendant Michael Alan Peck: (1) Defendant's Motion to Suppress Statements, [Doc. 14]; and (2) Defendant's Motion For Return of Seized Property, [Doc. 16].   For the following reasons, the undersigned **RECOMMENDS** that the motion to suppress statements be **DENIED**, and that the motion for return of property be **DENIED AS MOOT**.

**I.      *<u>Defendant's motion to suppress statements, [Doc. 14]</u>***

   **A.      *Facts***

On May 15, 2012, Department of Homeland Security (DHS) Special Agent David Westall was the lead case agent in a child pornography investigation of Defendant, and in connection with that investigation, Westall led the execution of a federal search warrant at Defendant's home.   [Doc. 24 (hereinafter "T__") at 9-10].

AO 72A
(Rev.8/82)

The warrant was executed at 6:15 a.m. by nine DHS agents, a GBI agent, and a uniformed City of Duluth police officer, each of whom arrived in a separate vehicle. T10, 31, 32.  It was just starting to get light outside.  T11.  Most of the agents were wearing raid gear, such as khaki pants, t-shirts that had "ICE" written on them, and vests identifying them as law enforcement agents, and were armed, although some of the DHS personnel were analysts (and thus may not have been armed).   T36.

Peck's residence was located in a cul-de-sac in a suburban neighborhood in Duluth, Georgia.  T33, 81.  Initially, the executing officers parked their vehicles up the street from Peck's home and approached the house on foot, and they only brought the vehicles closer to Defendant's home after the house was cleared.  T34, 36.  At that point, the flashing lights of the police vehicles were visible inside the house.  T85.  A police car was parked at the foot of the driveway.  T91.

Westall was first in a line of agents (referred to at the hearing as a "stack") that approached the front door of the residence.  T10.  DHS Special Agent Michael Ashley was directly behind Westall with a door ram.  T60.  The stacked agents, but not Westall, had their weapons drawn.  T11, 61.  Westall banged loudly on the door, announcing "Police," stating that they had a search warrant, and directing the occupants to open the door.  T11, 83, 86.

2

Defendant answered the door.  He was wearing a bathrobe (with underwear underneath) but no shoes, and it appeared he had just woken up.  T43, 67, 83, 90.  He did not have his car keys or wallet with him.  T43.  Westall asked him to step outside, and as he complied, Westall grabbed him by the hands and pulled him outside and to the side, onto the front concrete pad or immediately off of it so that the stack of agents could get by and enter the residence.[1]  In the presence of the uniformed police officer, Westall continued to hold Defendant's hands behind his back for four to five minutes, until the entry team cleared the house.  T12, 13, 39, 42, 61, 70, 87.  Peck was not handcuffed, however.  T13.

Westall explained to Peck that they were there to execute a search warrant for child pornography because an IP address led them to his house.  T11, 14.  He further explained that the search would take a few hours and that Westall knew who he was from a photograph.  T14.  Peck told Westall that his wife and children were also in the home.  T15-16.  Peck's request to enter the house and get his daughter, who had sprained her ankle, was refused.  T89.  Peck's wife, Danita—who was dressed in pajamas and a bathrobe and was coming down the stairs as her husband was taken outside—and their two children (a boy, age eleven at the time, and a girl, age fourteen

---

[1]      Since Peck answered the door, the door ram was not used.

3

at the time, T108) were located and also brought outside.  T39-40, 81, 87.  Ms. Peck

and the children stood by her car in the driveway, with an agent about four feet away

from them.  T88, 89.

Westall also told Defendant that he was not required to stay at the house if he did

not want to stay, nor did he have to come back into the house.  T14, 43-44.[2]  He also

told Peck that if he elected to stay, he would be restricted to the living room and would

not have free run of his house.  T14, 45.  Westall did not mention arrest, nor did he

advise Peck whether he was subject to arrest.  T15.

Peck elected to stay, and once the house was cleared by the entry team, DHS

Special Agent Ashley escorted Defendant into the house.  T16, 61.  Like Defendant,

Ms. Peck was directed into the house but not touched by the agents.  T91.  Defendant,

his wife, and their two children were directed to the living room, which contained a

large brown sofa, an arm chair, and a television, and they were told to be seated.  T45,

91, 92; Deft. Exs. 7-9.  The living room was the most comfortable room in the house

for seating more than a few people.  T102.  The television was turned on for the

children, and an agent stood by the door leading to the backyard patio.  T93.  None of

---

[2]       Westall testified that if Peck had wanted to leave, Westall would have
arranged for him to get clothes and shoes.  T44.

4

the Pecks asked to sit elsewhere in the home.  T102.  Although Ms. Peck described the

agents' knocking on the door as "forceful," she also testified that the agents were "very

respectful at all times."  T104.  Defendant was not searched or patted down.  T104.

Although the agents possessed "raid gear," they never used it.  T104.[3]  The agents used

the kitchen table area, which adjoined the living room, to collect and inventory seized

evidence.  T112.  The front door to the house stayed open, and an officer stood inside

the front door, another was outside the front door, and a third was beside the closed

back door leading to the patio.  T108.

Approximately ten minutes after the agents arrived, while Defendant was seated

in the living room with his family, Westall asked Defendant if he would like to speak

with the agents, and Defendant replied that he would.  T16-17, 48, 71, 77.[4]  There were

no threats or promises, nor did the agents discuss criminal charges with Defendant.

T17-18.  The agents wanted to hold the interview in a more private part of the house.

---

[3]      The Court also notes that the "raid gear" worn in this case apparently was not the tactical or SWAT military-style outfits not infrequently donned in many search warrant executions.

[4]      Ms. Peck testified that she overheard the agents ask her husband, "Can we ask you some questions?" and stating, "Let's go to another place."  T95.

5

T48-49.[5]  Westall asked if there was a more private place away from Defendant's family, and Defendant, Westall, and Ashley went upstairs to one of the children's bedrooms.  T18, 62.  Westall led the way upstairs followed by Defendant and Ashley.  T18.  Defendant did not indicate that he did not want to go upstairs, nor was there any resistance on his part.  T19.  Neither agent touched Defendant as they went upstairs.  T17, 67.

They entered Defendant's son's bedroom, which was standard-size room with a bed, dresser, and closet.  T19, 50-51.  The agents may have removed their raid vests by this time.  T76.  Westall did not go into the master bedroom because it contained computer equipment and was going to be searched.  T49.  Defendant sat on the bed, and Westall sat down next to him.  T51, 63.  Ashley came in, closed the door for privacy (but did not lock it), and stood to the left of the door.  T19, 51-52, 63.  The doorway was not blocked.  T20, 63.  The agents' weapons were holstered.  T63.[6]

---

[5]  *See also* T106 (Ms. Peck testifying that given the subject matter of the questioning, it would have been inappropriate to conduct it in front of the children).

[6]  At some point while Defendant was in his son's room with the agents, Ms. Peck was asked by one or more of the agents if she would answer questions, and she agreed.  T96, 106.  She was escorted upstairs to the daughter's room by two agents, one male and one female.  The door to the son's room was closed, and she could not hear any sound coming from that room.  T96-97.  After speaking with the agents, Ms. Peck was allowed to rejoin the children in the living room.  T100.  Her husband

6

Westall described Defendant as compliant and very respectful. T53, 54. Westall knew that he had been in the military for some time. T53.[7] The interview began at 6:25 a.m., lasted 43 minutes, and was audio recorded. T21, 22; Gov't Ex. 2 (hereinafter "DVD") at 00:11.[8] Although Westall testified that at the beginning of the interview, he told Defendant that he did not have to speak with them and that he was free to leave, T20, the audio of the interview does not reflect that advice.[9]

At the start of the recording, Westall told Defendant that "disturbing images" were transmitted from a computer that was traced from his house to an agent's computer and that the agents were tasked with seeing whether any children at the location were abused or in danger. DVD at 00:31-56; T55.[10] When asked if he knew

_____

was still in the son's room with other agents. *Id.* She did not feel that she or anybody else was under arrest that day. T107. She also did not feel that she could leave, but she did not ask to leave. T110.

[7]     Defendant was a master sergeant in the U.S. Air Force, retiring in 2007 after 21 years of service. T82. Ms. Peck described her husband as a follower of authority. T82.

[8]     The Court was not supplied with a transcript of the recording.

[9]     Although Westall also testified that he told Defendant that he was not looking to arrest him, on more direct questioning, Westall denied making that statement. T20.

[10]     Westall testified that one of his concerns when investigating child pornography cases is whether the children depicted in the pornographic media resided

7

anything about those images, Defendant admitted running a peer-to-peer (P2P) sharing program and "download[ing] porn," wondering whether there was "maybe anything in there." DVD at 1:05-13. He described the name of the P2P program, but denied having seen any child pornography through that site. *Id.* at 1:37. Defendant admitted he was a computer programmer. *Id.* at 2:23. He was advised by Westall that (1) the forensic computer analyst was searching his computer and other items in the house, (2) the analyst would be able to view files, even those that had been deleted, (3) some of the child pornography that was sent from his computer depicted victims who were not present in the government's database of known child pornography victims, and (4) the agents wanted to find out how he transmitted those images and the identity of the depicted children. *Id.* at 2:26-3:30. Defendant responded that it had been awhile since he ran that program, and that he did not know what was on the computer, although there might be child pornography on the it. *Id.* at 3:59.

Defendant denied searching for child pornography on his computer, instead stating that he would search for files using other sexual terms (e.g., "blow jobs"), to which Westall responded that the analyst would be able to search for the terms he used, recalling the Casey Anthony case in Florida where the forensic examiner found that she

_____

in the locations being searched. T56.

searched the Internet for "chloroform." *Id.* at 5:02.  Westall sought Defendant's assistance in determining the search terms he used. *Id.* at 5:14.  Defendant denied he was part of a conspiracy to use children as sex slaves. *Id.* at 5:25.

Westall then summarized one of the videos that came from Defendant's computer, describing the contents as depicting sex acts with and between children. Defendant responded that the video might still be on his computer, but that the girls depicted did not include his daughter. *Id.* at 6:58.  He stated he received the video from the P2P program, but did not know anything else about the source of the video. *Id.* at 7:10.  In response to Westall's question whether he would help in locating the source, Defendant stated he would do what he could. *Id.* at 7:21.  He denied that anyone else in his house was looking at child pornography. *Id.* at 9:03.  He also denied using children's ages (specifically, five, twelve, or thirteen years of age) as search terms. *Id.* at 10:00.

Westall then stated that they were trying to find who made these videos and that to lie to or mislead him was a felony under federal law. *Id.* at 10:10-28.  He also told Defendant that his lack of cooperation in helping to "rescue these children" would be brought to the attention of the prosecutor, concluding, "God help you if they are American children." *Id.* at 10:30-11:02.  Defendant then stated he would help as much

as he could, acknowledging that he probably searched for videos using age terms. *Id.* at 11:25.

Defendant then described how the program worked, adding that most of his searches occurred late at night. *Id.* at 15:30. He did not know which search terms he used to download the video depicting thirteen-year-old girls that the agents then received from Defendant's computer. *Id.* at 16:30-17:03. He again denied that the girl on the video was his daughter. *Id.* at 17:40. He guessed that the video ended up on the agent's computer because the P2P program was running. *Id.* at 18:10. He claimed to have deleted what he thought was child pornography when it appeared on his computer, but there might be some child pornography on his computer because he had not gone through all of the downloaded files. *Id.* at 20:10, 21:50. Although Defendant denied that there would be any videos of infants or toddlers, he conceded that one video depicting six-to-ten-year-olds may have "popped up" but stated, "I am not into that stuff." *Id.* at 23:08. He stated that the youngest person on the videos would be in her late teens. *Id.* at 23:20.

Westall said that there were at least two videos the agents downloaded and at least 86 more videos that the agents did not download that came from his computer and that contained child pornography. *Id.* at 24:50. He further stated that the discovery of

10

videos depicting children who were unknown to the agents was what motivated the search warrant at the residence. *Id.* at 26:12. Defendant again denied involving his children in videos or touching his children in an inappropriate way, *id.* at 26:26, and he also denied having contact with any children in an inappropriate manner. *Id.* at 26:36.

Westall then told Defendant that he thought his answers about his own children and contact with other children were definite and thus appeared truthful to him, but that some of his other answers about how child pornography got onto his computer were less than forthright. *Id.* at 27:25.

Defendant then acknowledged he was only person in the household who had downloaded pornography. *Id.* at 27:41. In response to further questioning, *id.* at 28:30, he stated he used search terms "young," "16," and "17." *Id.* at 29:05-12. He admitted being addicted to pornography. *Id.* at 29:33. He also stated that the use of the search term "PTHC" returned results containing young nudes (meaning ages sixteen-to-seventeen) and "some sex." *Id.* at 31:40.

Defendant stated that he was familiar with computers since he worked as a computer programmer. *Id.* at 31:50. He recognized that most of the videos on the P2P program were not labeled properly. *Id.* at 32:30. He grudgingly conceded that his

11

search for sixteen-to-seventeen-year-olds amounted to a search for child pornography. *Id.* at 32:50-33:00.

Peck again denied having sex with his fourteen-year-old daughter. *Id.* at 33:43. He had discussions with the agents about his relationship with his wife, *id.* at 35:00, what he did while watching pornography, *id.* at 36:40, and the password for and who has access to his computer. *Id.* at 37:30.

In response to being asked whether he had any questions for the agents, *id.* at 38:22, Defendant asked whether there was anything he could do to try to help them, *id.* at 38:33.

Defendant asked the agents whether they were seizing his computer and asked them to be careful with it because it had home movies and such on it. T23; DVD at 41:40-42:00. He also gave the agents search terms to more easily locate specific child pornography on the computer. T24; DVD at 41:15.

Toward the conclusion of the interview, Westall asked Defendant his opinion of the agents' job that day, and Defendant responded, "Well, if you're going for shock and awe this morning, you did a good job," adding, "I think you've done just fine." T24; DVD at 42:08. Although Defendant stated that he felt "very intimidated" initially when the agents came to the door and again in being brought into the bedroom, he stated that

12

he did not feel intimidated at the end of the interview, nor did he feel threatened.  T25, 41; DVD at 42:38-42:42.  Defendant stated that he did not feel threatened to give any statements and that he gave those statements freely and voluntarily.  T26; DVD at 42:50-54.

After turning off the recording device, Westall asked Defendant if he would write a statement.  T27.  Defendant agreed to write a statement and asked Westall what he could write to help.  T28.  Westall advised him to write how they could find the child pornography on his computer.  T28.  While Defendant handwrote the statement, Gov't Ex. 3,[11] Ashley left the room, leaving the door open.  T28, 68.

---

[11]     The written statement, all in Peck's handwriting, provided:

Michael Peck
5-15-2012

Program used to search -ACQLite connects to 4 nodes on startup.  All searches go through these nodes.  I think these nodes are stored in configuration for the program.

Searches that I remember making:
Blowjob, Deepthroat, Threesome, Young, teen, lesbian, lesbo, lez, Facial, Public, flashing, beach sex, Big tits, small tits, car sex, BDSM, wifey, IDeepthroat, 18 yo, 17 yo, 16 yo, schoolgirl, hidden cam, shower, web cam, pthc, orgy, Gang bang, stripper, Party, solo, masturbate, foursome, group

13

Westall described, and the audio confirms, that the tone of the conversation was conversational and Defendant's demeanor was calm.  T21; *see also* T64.  The agents did not raise their voices during the interview.  T21, 64.  Defendant was not advised of his *Miranda* warnings because the Westall did not believe he was in custody.  T21. Peck did not ask to terminate the interview, to have a lawyer present, or to consult with anyone.  T21, 64.  Although there were no discussions about criminal charges, as noted, during the interview, Defendant made incriminating admissions about child pornography.  T24, 66.

Once they went back downstairs, Westall advised Defendant that he was free to leave and did not have to stay, but Defendant stayed and watched TV with his wife. T29.[12]  The children left for school on the school bus at 8:40 a.m.  The agents left

---

Searches were all done on desktop (Mac Mini) and late at night.  I would select all search results and save and from time to time look at results and delete stuff I wasn't interested in, though I didn't often go through the files.

Gov't Ex. 3; T29.

[12]    When Defendant was upstairs being questioned, Ms. Peck began to fidget and straighten up papers on the bookshelf in the living room, but an agent told her to sit down.  T93, 113.

14

around 10:00 a.m.  T110, 112.  Defendant was not formally arrested that day and was not arrested on child pornography charges until the next year.  T30.

### B.     Discussion

#### 1.     Burden of proof

At issue in this case is whether Defendant was in custody such that the agents' failure to advise him of his *Miranda* rights renders his statements inadmissible. Initially, Defendant argues that the Court was wrong in assigning him the burden of proving that he was in custody for purposes of *Miranda*.  He argues that the case that placed that burden of proof upon the defendant, *United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977), (1) has "not aged well," since it has not been cited by the Eleventh Circuit for that principle, (2) should not be the law of this Circuit, and (3) was wrongly decided because it requires a defendant to prove the merits of a *Miranda* claim in order to raise it.  [Doc. 28 at 12-14].  Despite these arguments, Defendant did not cite to contrary Eleventh Circuit opinions, nor did he cite to any case law in support of his argument.  Although the government recognized that Defendant had the burden, at the evidentiary hearing, it volunteered to put up evidence first.  T8.

The former Fifth Circuit held in *de la Fuente* that the defendant bears the burden of establishing that he was in custody and that his statements were made in response to

15

government questioning. *See de la Fuente*, 548 F.2d at 533 ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.").  The Court is bound to follow that holding even if it disagrees with it.  *See Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (where the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981); *see also Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (recognizing that "a district court in this circuit is bound by this court's decisions"); *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1508 (11th Cir. 1987) ("Absent a Supreme Court decision to the contrary, district courts are compelled to follow mandates of appellate courts.") (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895); *Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492 (1838)); *Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) ("District courts are . . . bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.' ") (quoting *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981)).  Thus, the Court is bound to apply *de la Fuente*.

16

In any event, other courts have followed *de la Fuente*, its progeny, or similar reasoning and have assigned the burden of proof to the defendant seeking to challenge the admissibility of statements in the absence of a formal arrest. *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984) (citing *de la Fuente*, 548 F.2d at 533, for the proposition that generally both the burden of production and the burden of persuasion rest upon the party seeking suppression), *overruled on other grounds, United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) (holding defendant "had the burden of proving that he was under arrest or in custody" when seeking suppression of statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Lawrence*, 892 F.2d 80, at *5 (6th Cir. 1989) (unpublished Table decision) (quoting *Charles*, 738 F.2d at 692); *see also United States v. Shteyman*, No. 10 CR 347(SJ), 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) ("The Court notes that on a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation."); *United States v. Artis*, No. 5:10-cr-15-01, 2010 WL 3767723, at *4 (D. Vt. Sept.16, 2010) ("The weight of authority appears to hold that a defendant bears the burden of

establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence."); *United States v. Sciolino*, No. 2:09-CR-0070 FCD, 2009 WL 2914570, at *3 (E.D. Cal. Sept. 9, 2009) ("The Fifth Circuit, Eighth Circuit, and numerous district courts have also explicitly held that a defendant bears the burden of proving he was in custody at the time incriminating statements were made.") (collecting cases)).

Defendant additionally argues that the *de la Fuente* holding was not based on any reasoning. That is incorrect, however. In fact, the *de la Fuente* Court noted "that the burdens of production and persuasion generally rest upon the movant in a suppression hearing," notwithstanding that in "some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant." *De La Fuente*, 548 F.2d at 533 (citing cases). It also pointed specifically to the issue at hand as one of those "well-defined situations": the defendant's burden to demonstrate that he was subjected to custodial interrogation before casting the burden on the government to prove the voluntary waiver of his self-incrimination rights. *Id*.

Also, the Court rejects Defendant's argument that by assigning him the burden to demonstrate that he was in custody, it has required him to prove the merits of the

18

underlying *Miranda* claim.  The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), apply only in the context of a custodial interrogation.  *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009); *see also United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983) (holding that under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights").  Before admitting a custodial interrogation, *inter alia*, the government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily.  *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).  Thus, the elements of a *Miranda* claim are the recitation of the *Miranda* warnings, *United States v. Street*, 472 F.3d 1298, 1311 (11th Cir. 2006), and that the defendant waived his rights "voluntarily, knowingly, and intelligently." *Colorado v. Spring*, 479 U.S. 564, 572-73  (1987); *Hart v. Attorney General*, 323 F.3d 884, 892-93 (11th Cir. 2003); *United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996).  *Miranda*'s protections do not come into play until a suspect is in custody.  *United States v. Carson*, 520 Fed. Appx. 874, 886 (11th Cir. May 31, 2013) ("[T]he trigger for *Miranda* protections is custody.").  Requiring the defendant to establish the entitlement to *Miranda*'s protections does not require the defendant to

19

prove the underlying *Miranda* violation, but only to demonstrate that he is entitled to *Miranda*'s protections in the first place.

As a result, the Court rejects Defendant's challenge to the assignment of burdens in this case. Defendant carries the burden of first showing that he was in custody and that *Miranda* warnings were therefore necessary. However, the Court's recommendation would be the same if the government shouldered the burden of demonstrating that Defendant was *not* in custody and *Miranda* warnings were not necessary.

### 2.   *Was Defendant in custody for purposes of* **Miranda?**

#### a.   **Arguments of the parties**

Defendant argues that the totality of the circumstances compels the conclusion that he was in custody and entitled to *Miranda* advice before questioning because, although the questioning occurred at his home, "the home was overrun with agents who thoroughly dominated him and his family." [Doc. 28 at 15-16 (citing, *inter alia*, *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008))].

In support, he points to the following facts. First, while recognizing case law disfavoring a finding of custody when the interrogation occurs in the suspect's own home, he argues that in his case, the home interview was rendered custodial because he

was subjected to a police-dominated environment where he was cut off from his family and the outside world.  [*Id.* at 17-18].  He argues that because his home was invaded by a dozen law enforcement officers, he had no place else to go, and his home—one's typical final place of refuge—offered no refuge at all.  [*Id.* at 19].

Second, he argues that Westall's advice that he was free to leave was meaningless lip service, since at the time, his home was flooded with law enforcement officers there to search his house.  [*Id.* at 21].  He also submits that the large number of police officers in his home (who initially brandished their weapons) left him no realistic place to which he might retreat in the event that he wished to terminate the interview.  [*Id.* at 22].

Third, Defendant argues that the officers had physical control or restraint over him the entire time because (1) he was physically restrained at the beginning of the encounter, [*id.* at 23]; (2) the officers used non-physical intimidation to induce him to participate in the interrogation, including directing him to sit on the couch and prohibiting free movement within his home; (3) the officers directed him where to go to be questioned; (4) there were sentries posted at the doors, and a police vehicle blocked the driveway; (5) the tone and nature of the questioning amounted to "thinly-veiled threats of the most horrible varieties of criminal behavior," [*id.* at 23-24];

21

(6) the interrogation occurred in a closed room where he was isolated from his family, with an agent standing next to the door, [*id.* at 25-27]; and (7) Westall's accusatory questioning, particularly as to whether Defendant's own daughter was depicted in the video images, combined with Defendant's obedient nature developed by years in the military, made it more likely that he would endure the inquisition than terminate the interview and leave.  [*Id.* at 29].

Finally, Defendant attempts to distinguish his case from the undersigned's recommendation in *United States v. Asher*, No.  1:09-cr-414-JOF-AJB, 2010 WL 4192883 (N.D. Ga. Feb. 25, 2010) (R&R), *adopted* 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010) (Duffey, J.), where the undersigned found that the defendant was not in custody for purposes of *Miranda* under circumstances Peck describes as much less coercive than present here.  Among other differences between *Asher* and the case at hand, Defendant points out that Asher was not physically held prior to questioning, he was told he was not under arrest, no weapons were drawn, Asher and his wife were not restricted to a certain room of the house, the questioning did not begin accusingly, and the questioning occurred at the dining room table.  [*Id.* at 30-31 (citing Doc. 33 in No. 1:09-cr-414-WSD)].

22

In response, the government argues that Defendant was not in custody and thus was not entitled to *Miranda* warnings.  It argues that the questioning took place at Defendant's home, where courts are less likely to find custody, and that Westall told him at the outset of the search warrant execution that he was free to leave (a fact that Defendant concedes in his brief).  [Doc. 30 at 9-10 & n.6 (citing Doc. 28 at 21)].  It also points out that Defendant never asked to leave.  [*Id.* at 11].  The government further contends that Defendant was with his family in the living room until Westall asked him if the agents could question him, to which he responded affirmatively and voluntarily accompanied the agents upstairs.  [*Id.*].  It also contends that at the beginning of the interview, Westall told Defendant that he was free to leave, the agents did not prohibit anyone from coming or going during the interview, Defendant was not handcuffed nor restrained in any way, no weapons were brandished during the interview, and there was no mention of arrest, custody, or likely criminal charges.  [*Id.*].  It also points out that while the bedroom door was closed, it was not locked, nor was it blocked.  [*Id.*].  The government further submits that the tone of the interview was calm and conversational, and Peck never asked to terminate the interview or to speak with a lawyer.  [*Id.* at 11-12].

AO 72A
(Rev.8/82)

The government also contends that the Court should not rely on *Craighead*, since it is not binding authority in this Circuit and, in any event, it is substantially distinguishable from this case. [*Id.* at 12-13]. It differentiates *Craighead* by pointing out that the defendant there was an Air Force employee whose residence was on an Air Force base, and the law enforcement agents brought the defendant's supervisor to the search warrant execution. The defendant there was directed to and interviewed in an unfinished storage room in his home, where he sat on a box while the agent squatted, and another agent stood with his back to the closed door. *Craighead*, 539 F.3d at 1077-78, 1086, 1089. The government also points out that the *Craighead* court was concerned about the interview location, noting that it occurred in the storage room instead of " 'a suspect's kitchen, living room, or bedroom [which] might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere.' " [Doc. 30 at 13 (quoting *Craighead*, 539 F.3d at 1088)]. It also points to the *Craighead* court being troubled by Craighead's supervisor not being allowed in the storage room, which to the

24

court made it appear unlikely that the defendant was free to leave since he could not invite others into the storage room.  [*Id.* (quoting *Craighead*, 539 F.3d at 1087)].[13]

The government then contends that unlike *Craighead*, the interview in this case was recorded, and the recording demonstrates that although Defendant stated he was initially intimidated, he was not threatened to make a statement, and his statement was freely and voluntarily given.  [*Id.* at 15].  It also submits that Ms. Peck's testimony supports the proposition that Defendant was not in custody.  [*Id.*].

Finally, the government argues that while Peck relied on *Craighead*, he ignored the Eleventh Circuit's most recent (although unpublished) decision on the in-custody issue, *United States v. Matcovich*, 552 Fed. Appx. 850 (11th Cir. July 3, 2013), where the court found that the defendant was not in custody based on facts strikingly similar to those in the instant case.  [Doc. 30 at 16-17].

In reply, Defendant argues that Westall's belief (as well as Ms. Peck's) as to Defendant's custodial status is irrelevant because the test is based on objective considerations, and in any event, Westall never communicated his intentions to

---

[13]    The government also cited to portions of the *Craighead* decision where the court referred to portions of the defendant's testimony at the evidentiary hearing, and argued that although the *Craighead* Court framed the issue as an objective inquiry, it considered Craighead's subjective views as well.  [Doc. 30 at 14]

25

Defendant.  [Doc. 32 at 1-2 & n.1].  Defendant next argues that his offer of assistance to the agents is not proof of his belief that he was not in custody, since that offer of assistance demonstrates a truism that an incarcerated subject is more likely to cooperate.  [*Id.* at 2-3].

He also contends that since Ms. Peck and the Peck children were required to sit in the living room, contrary to the government's argument, there is evidence that others were prevented from joining Defendant in the bedroom during the interview.  [*Id.* at 3]. He also argues that the fact that he was not physically restrained in the bedroom ignores the obvious fact that there was no need to restrain him because he already had submitted to the police authority.  [*Id.*].  He also faults the government's attempt to distinguish *Craighead*, arguing that that case was instructive for its analysis of the many factors relevant to the in-custody inquiry, despite the opinion being from outside this Circuit.  [*Id.* at 3-4].  He also contends that *Matcovich* is of little value in this case because the interview in that case was peaceful and non-accusatory, as opposed to the interview in this case, which "focused upon child sexual abuse, child enslavement and incest" and was "accusatory, slanderous, and terrifying."  [*Id.* at 5].  Moreover, he argues, the *Matcovich* defendant was allowed to take a smoke break and was advised by the agent that he was not under arrest.  [*Id.* at 5-6].

26

**b.      Analysis**

The right to *Miranda* warnings attaches when custodial interrogation begins. *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  *Miranda* itself held that pre-interrogation warnings are required in the context of custodial interrogations given "the compulsion inherent in custodial surroundings." *Miranda*, 384 U.S. at 458.  The Court explained that "custodial interrogation" meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.  However, as the Court noted in *Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004), the *Miranda* decision did not provide the Court with an opportunity to apply that test to a set of facts.  As those opportunities arose, the Court defined custody for the purposes of *Miranda* as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted); *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *New York v. Quarles*, 467 U.S. 649, 655 (1984); *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).

"[W]hether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011); *see also Yarborough*, 541 U.S. at 663 (same).

27

Thus, the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant, and the reasonable person from whose perspective "custody" is defined is a reasonable innocent person. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quotations, citations, alteration, and emphasis omitted).  Therefore, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442.

The Supreme Court has recently addressed the issue of custody for purposes of requiring the *Miranda* warnings and provided a non-exhaustive list of factors courts should consider:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.  In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," *Stansbury v. California*, 511 U.S. 318, 322-[]23, 325[ ] (1994) (per curiam), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112[ ] (1995).  And in order to determine how a suspect would have "gauge[d]" his "freedom of movement," courts must examine "all of the circumstances surrounding the interrogation." *Stansbury*, *supra*, at 322, 325[ ] (internal quotation marks omitted).  Relevant factors include the location of the questioning, *see* [*Maryland v.*] *Shatzer*, [559 U.S. ----, ----], 130 S. Ct. [1213], 1223-

28

[]26 [(2012], its duration, *see Berkemer v. McCarty*, 468 U.S. 420, 437-[]38[ ] (1984), statements made during the interview, *see* [*Oregon v.*] *Mathiason*, [429 U.S. 492], 495[ ] [(1977)]; *Yarborough v. Alvarado*, 541 U.S. 652, 665[ ] (2004); *Stansbury*, *supra*, at 325[ ], the presence or absence of physical restraints during the questioning, *see New York v. Quarles*, 467 U.S. 649, 655[ ] (1984), and the release of the interviewee at the end of the questioning, *see California v. Beheler*, 463 U.S. 1121, 1122-[]23[ ] (1983) (per curiam).

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, *Berkemer*, *supra*, at 437[ ], and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. "Our cases make clear . . . that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Shatzer*, 559 U.S.[] at ----, 130 S. Ct.[] at 1224.

*Howes v. Fields*, 132 S. Ct. 1181, 1189-90 (2012); *see also United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (explaining that "although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes. . . . Rather, 'a free-to-leave inquiry reveals only whether the person questioned was seized.' . . . While 'seizure is a necessary

29

prerequisite to *Miranda*, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.' ") (citations omitted).

In *Howes*, the Court rejected the Sixth Circuit's categorical rule that questioning an incarcerated prisoner in private outside the presence of his fellow inmates created a custodial interrogation necessitating *Miranda* warnings, but in so doing, it indicated that in some circumstances, isolating a non-prisoner subjected to police questioning is a factor to consider in determining whether the person is in custody for *Miranda* purposes:

> When a person who is not serving a prison term is questioned, isolation may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support.  And without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated.

*Howes*, 132 S. Ct. at 1191.

In addition to the factors set forth in *Howes*, the Eleventh Circuit directs courts to also consider several other factors in determining custody, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."  *United States v.*

30

*Street*, 472 F.3d 1298, 1309 (11ᵗʰ Cir. 2006) (quotation omitted).[14]  In considering the

totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome

determinative—[the court] simply weigh[s] the totality of the circumstances." *United*

*States v. Lall*, 607 F.3d 1277, 1284 (11ᵗʰ Cir. 2010) (quoting *Brown*, 441 F.3d at 1349)

(alterations added).

A weighing of the totality of the circumstances leads to a conclusion that

Defendant was not in custody for *Miranda* purposes.  Initially, since the Court

considers only objective facts in determining whether Defendant was in custody, it does

---

[14]     The Eighth Circuit employs a nonexclusive, six-factor test when making such a determination:  (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong-arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.  *United States v. Griffin*, 922 F.2d 1343, 1349 (8ᵗʰ Cir.  1990).

The Fourth Circuit considers (1) the time, place, and purpose of the encounter, (2) the words used by the officer, (3) the officer's tone of voice and general demeanor, (4) the presence of multiple officers, (5) the potential display of a weapon by an officer, (6) whether there was any physical contact between the officer and the defendant, (7) the suspect's isolation and separation from family, and (8) physical restrictions. *United States v. Hashime*, --- F.3d ----, ----, 2013 WL 5790163, at *3-4 (4ᵗʰ Cir. Oct. 29, 2013).

not consider the agents' testimony that they did not believe that Defendant was in custody, Defendant's military background and subjective feelings of intimidation ("shock and awe"), or Ms. Peck's conclusions that no one in the house was in custody.

As for the objective factors, first, Defendant was questioned in his home. As the Eleventh Circuit has noted, although questioning in one's home is not dispositive, *Brown*, 441 F.3d at 1348, " 'courts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *United States v. Gomes*, 279 Fed. Appx. 861, 868 (11th Cir. May 29, 2008) (quoting *Brown*, 441 F.3d at 1348) (quotation and alteration omitted); *see also United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) (noting that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial").

Moreover, the Court concludes that interviewing Defendant in his son's bedroom with the door closed does not weigh in favor of custody. The record is not completely clear as to how that room was chosen as the interview room, but this environment is clearly distinguishable from the unfinished storage room in *Craighead* and the unfinished basement storage area in *United States v. Hashime*, --- F.3d ----, ----, 2013 WL 5790163, at *2 (4th Cir. Oct. 29, 2013). Unlike in *Craighead*, the bedroom

32

door in this case was not blocked by an agent, and the sound of other agents walking outside the room, and to a lesser extent, their voices, could be heard, T76-77, so that Defendant was not in total isolation.  The evidence shows that Defendant chose to sit on the bed, as opposed to being directed to sit there.  While it is true that the environment for the questioning was more restrictive than the dining room table in *Asher*, and Defendant was separated from his family, the room was both familiar and comfortable.  *See United States v. Cerreta*, 63 Fed. Appx. 585, 587 (2d Cir. May 15, 2003) (questioning in bedroom by two agents with door closed but not locked or blocked did not amount to custodial interrogation); *see also United States v. Johnson*, Criminal No. WDQ-10-0799, 2011 WL 6202847, at *4 (D. Md. Dec.7, 2011) (holding that "[a] suspect is not in custody simply because law enforcement officers tell [him] they would like to question [him], or speak to [him] inside a confined space like a vehicle.  That a suspect answers questions in a police vehicle, with the doors and windows closed, does not necessarily create custodial interrogation." (citations omitted)).

The Court recognizes the Supreme Court's suggestion that isolation from one's family may contribute to a coercive atmosphere by preventing family members, friends, and others who may be sympathetic from providing either advice or emotional support,

33

and without any such assistance, the person who is questioned may feel overwhelming pressure to speak and to refrain from asking that the interview be terminated.  *Howes*, 132 S. Ct. at 1191.  Other courts have held that separation from one's family is a factor in favor of finding custody.  *Hashime*, --- F.3d at ----, 2013 WL 5790163, at *5-7 (child pornography investigation); *United States v. Cavazos*, 668 F.3d 190, 194 (5th Cir. 2012) (same); *United States v. Griffin*, 7 F.3d 1512, 1519 (10th Cir. 1993) (drug investigation).  However, Defendant did not establish that his going upstairs was coerced, nor do the objective facts demonstrate that it was:  given the subject matter of the anticipated questioning, of which Defendant was aware since he was told the search warrant was issued for child pornography coming from an IP address associated with him, T14, a reasonable innocent person would not conclude that being questioned behind closed doors when there were children in the house was tantamount to being arrested.  *See Berkemer*, 468 U.S. at 441 (describing the in-custody test as whether a reasonable person in the defendant's position would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest").[15]

_____

[15]    The location of the interview also distinguishes this case from *United States v. Colonna*, 511 F.3d 433 (4th Cir. 2007), where the defendant was questioned in the back seat of an FBI vehicle while being bracketed by two agents.  *Id.* at 433, 436.

Second, the duration of Peck's detention prior to and during the questioning was approximately one hour. The Eleventh Circuit has found even longer periods of questioning to not constitute custody for *Miranda* purposes. *McDowell*, 250 F.3d at 1362 (four hours); *Muegge*, 225 F.3d at 1269-71 (defendant interviewed for about two and a half hours); *Tukes v. Dugger*, 911 F.2d 508, 515-16 (11th Cir. 1990) (one hour); *United States v. Wright*, 680 F.2d 142, 143 (11th Cir. 1982) (same); *see also Yarborough*, 541 U.S. at 655-58 (suspect not in custody when his parents brought him to station at detective's request, he was interviewed in small room for two hours by one detective, interview was recorded, and detective pressed suspect to reveal details of crime by appealing to his "sense of honesty"); *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (interview of two-and-a-half hours was not custodial); *United States v. Manta-Carillo*, Criminal No. 11-00103-CB, 2011 WL 3235757, at *2, *4 (S.D. Ala. July 28, 2011) (finding no custody where, among other things, the interview lasted about an hour and a half); *Trantham v. Province*, No. CIV 07-156-JHP-KEW, 2010 WL 3734720, at *3 (E.D. Okla. Aug. 2, 2010) (holding defendant not "in custody" at any time when he met officer at a motel, not a police station, for approximately two hours); *United States v. Jefferson*, 562 F. Supp. 2d 707, 717-18 (E.D. Va. 2008) (holding defendant not "in custody" for *Miranda* purposes when two

35

FBI agents interviewed him for approximately two hours in his home concerning bribery investigation).  The duration of the question points to it being non-custodial.

Third, there are no statements to Defendant which communicated that he was not free to leave or terminate the interview.  Defendant does not dispute that after Westall initially grabbed him and took him outside, he was advised that he was free to leave and that he did not have to stay.  [*See* Doc. 28 at 5].  "Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.' "  *Brown*, 441 F.3d at 1347 (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)); *but see United States v. Collona*, 511 F.3d 431, 436 (4th Cir. 2007) (reasoning that advice to defendant that he is not under arrest is only a factor to consider in order that police not be afforded a "complete 'end run' " around *Miranda*).  Although Defendant argues that Westall's statement was an illusory option given that Defendant was wearing only underwear and a bathrobe and did not have shoes on or have his keys or wallet, he never asked to either get dressed or leave, and in fact, agreed to reenter the house within a short period of time of being so advised. *Cf. Brown*, 441 F.3d at 1349 ("While Brown

36

was not free to wear his sneakers, he did have other options (albeit imperfect ones) for leaving the house.  He could have gone outside barefoot, he could have worn the other pair of sneakers that belonged to someone else, he could have walked the short distance to [his girlfriend's] car, or he could have called a friend for a ride.  Although he was plainly and repeatedly told he was free to go, he never tried any of those options; indeed, he never even told anyone he wanted to leave.").[16]  Since Defendant bears the burden of demonstrating that he was in custody, this fact points to a finding that he was not in custody for *Miranda* purposes.[17]

---

[16]     The advice given to Defendant that he was free to leave also distinguishes this case from *United States v. Cavazos*, 668 F.3d 190 (5th Cir. 2012).  There, in addition to being handcuffed as he was getting out of bed and having a phone call to his brother monitored by the police, *id.* at 192, the defendant was only advised that the questioning was a "non-custodial interview," which the court held would not have imparted to the reasonable  lay person that he could terminate the interview and leave. *Id.* at 195.

[17]     In addition, while there is no evidence that the agents advised Defendant he was *not* under arrest, there similarly is no evidence that he was told he was under arrest or would be arrested.  T23-24, 61-62, 65, 107.

At the same time, the Court does not find that Westall advised Defendant at the beginning of the questioning that he was free to leave and his questioning was voluntary, since the recording discloses no such advice and Westall took back his initial testimony that Defendant was so warned.  T20.

Fourth, Defendant was not handcuffed, searched, or patted down, nor was he required to get on the ground.  It is true that when the agents first encountered him, Defendant was grabbed and taken outside and his hands were held behind him for approximately five minutes while the house was being secured.  However, there is no evidence that these actions were undertaken with more than minimal force.  The Eleventh Circuit has concluded a defendant was not in custody where more forceful actions, including handcuffing the defendant, were taken.  *See United States v. Thomas*, 193 Fed. Appx. 881, 886 (11th Cir. Aug. 16, 2006) (no custody where defendant was initially handcuffed but the handcuffs were removed when defendant was questioned, and she was told she was not under arrest); *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995) (noting that "the fact that police handcuff the person . . . does not, as a matter of course, transform an investigatory stop into an arrest").  In this vein, there is no dispute that when Defendant was actually being questioned, he was not handcuffed, physically restrained, or otherwise touched.

As for other restrictions, the Court recognizes that Defendant was told by Westall that if he chose to re-enter the house, he would not have free run of it (during the search, which would last a number of hours), and he was directed to be seated in the living room.  T14, 45, 92.  These limitations make the issue much closer, but the

38

limitations on Defendant's freedom of movement were tempered by the fact that they would only last for the time it took to search the residence and thus had an expected endpoint, unlike the more open-ended prospect of a formal arrest, which is followed by book-in at a jail and presentment to a judge for the (potential) setting of a bond. Moreover, the Eleventh Circuit has found that the requirement that a subject sit while the house was being searched does not amount to custody.  *See Luna-Encinas*, 603 F.3d at 881-82 (no custody where defendant told to sit down outside while house was secured and later was taken to front of house and told to sit and not speak).  While the search in *Luna-Encinas* (for drugs and weapons) likely was less time-consuming than a search of computers for child pornography, and thus a defendant detained for a computer/child pornography search might have an expectation that his detention might be lengthy, the actual time prior to questioning that Defendant was required to sit in the living room with his family was about ten minutes.  Being required to sit with family members in the living room of one's home for ten minutes does not amount to the type of coercion associated with a formal arrest.

In addition, the restrictions placed upon Defendant and his family members were less than those found to amount to custody in other cases. *See Hashime*, --- F.3d at ----, 2013 WL 5790163, at *1 (defendant and family kept in

AO 72A
(Rev.8/82)

living room during sweep and not allowed to go to bathroom; defendant given his clothes but not shoes or socks; defendant's mother who was recovering from brain surgery was not allowed to go and lie down; and his family was not allowed to see defendant during the three-hour interrogation); *Collona*, 511 F.3d at 436 (agent instructed defendant's mother in defendant's presence that she could not smoke in her own house and if she chose to go outside to smoke, she could not reenter the home); *United States v. Mittel-Caray*, 493 F.3d 36, 38 (1st Cir. 2007) (defendant ordered to get dressed, go downstairs, and told where to sit; he was physically separated from his girlfriend and not allowed to speak with her alone; and he was escorted by agents when he moved, including going to the bathroom). Although Ms. Peck was at some point advised to stop straightening papers (which, to a reasonable officer, could interfere with the search being conducted) and to sit down, that direction came after Defendant was upstairs being questioned. T113. In addition, the children evidently were allowed to get dressed for school, T76, albeit without Ms. Peck's assistance and under agent supervision, and after Defendant's questioning had concluded. T110. These restrictions do not tip the scale to a finding of custody. *See Brown*, 441 F.3d at 1348-49 (holding that defendant was not in custody in part because he was in a familiar setting, his girlfriend's house, and because, "[a]lthough an officer accompanied him throughout

the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished"); *see also United States v. Opoku*, 210 Fed. Appx. 848, 852 (11th Cir. Dec. 13, 2006) (holding that escorting a subject around his own home while it is searched does not create a custodial situation).

Fifth, although most of the law enforcement officers had their firearms out when entering and clearing the house, there is no evidence that any firearms were unholstered after the first few minutes of their entry.  Similarly, while Ashley came prepared to use a battering ram, it was not deployed, nor was there any evidence that it was observed by Defendant.   Westall, who was the sole questioner according to the recording, did not brandish his firearm at any time during the entry, search, or questioning.  Also, although the police were equipped with "raid gear," none of it was used.  No firearms were brandished while Defendant was questioned.  T27, 63.

Sixth, as to the questioning itself, the record reflects that Westall advised Defendant that he would like to speak with him and asked him if he would speak with them, as opposed to demanding that Defendant speak with them.  T16-17, 62; *see also* T106 (Ms. Peck testifying, "They asked to ask some questions.  They asked me the same thing.").

41

While Westall did accuse Defendant of downloading and distributing child pornography and questioned whether Defendant had sex with his fourteen-year-old daughter, these accusations were not, in either language or tone employed, made in a coercive or heavy-handed manner such that they indicated that Defendant's cooperation with the agents was compelled.  Westall's comments that "God help" Defendant if the children in the downloaded videos were Americans, and his admonition that a false statement to a federal law enforcement officer is a crime, certainly were accusatory, but accusatory questioning alone has been held to be insufficient to render the interrogation custodial.  *Stansbury*, 511 U.S. at 325 ("Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest."); *Mathiason*, 429 U.S. at 495 ("Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' "); *Beckwith v. United States*, 425 U.S. 341, 346-47 (1976) (noting that it "was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda*

42

requirements with regard to custodial questioning"); *United States v. Jayyousi*, 657 F.3d 1085, 1111-12 (11th Cir. 2011) (holding that accusing suspect of lying did not make interview custodial); *United States v. Manor*, 936 F.2d 1238, 1241 (11th Cir. 1991) ("*Miranda* is not implicated simply because an individual is the subject or target of an investigation.") (citing *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984)).

Pointed questioning, however, does not necessarily convert a non-custodial interview into a custodial interrogation, as the Supreme Court held in *Mathiason*,

> a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because . . . the questioned person is one whom the police suspect.

*Mathiason*, 429 U.S. at 495; *see also Muegge*, 225 F.3d at 1270 (stating that "the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect" does not automatically create a custodial situation).[18]   In any event,

_____

[18]     It also is important to keep in mind that the Supreme Court has recognized that the voluntariness inquiry and the *Miranda* custody inquiry are not one and the same, *see Yarborough*, 541 U.S. at 667-68, since the former relies, at least in

43

while the questioning was pointed, it did not rise to the level of repeatedly accusing Peck of lying, which other courts have found transforms a non-custodial interview into custodial questioning.  *See United States v. Lanni*, 951 F.2d 440, 443 (1st Cir. 1991) (weighing agent's expression of disbelief at suspect's profession of innocence in favor of custody); *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (holding that agents had placed defendant in custody by, among other actions, "accusing [him] repeatedly of lying" and "insisting on the 'truth' until he told them what they sought"). Instead, the tone of the questioning as demonstrated by the recording was conversational, calm, deliberate, and not threatening, and did not convey that compliance was compelled.  Thus, Defendant has not shown that either the extent or the timing of these statements rose to the level of compulsion, which would tip the scales from a noncustodial interview to a custodial one.

Seventh, the Court notes that at the conclusion of the interview, Defendant was not formally arrested, and he was not charged with a crime until nearly a year later.  As a result, the Court concludes that the totality of the circumstances demonstrates that

---

part, on the subjective characteristics of the suspect (for example, his age), while the *Miranda* inquiry is objective.  Thus, Peck's respect for or passive attitude towards authority is irrelevant.

44

Defendant was not in custody during the interview and therefore was not entitled to *Miranda* warnings while questioned.

The Court recognizes that Peck's case is factually distinguishable from *Asher* in a number of respects, such as no weapons were drawn, the defendant was allowed to change into clothes from his pajamas (because he asked), and the interview was conducted in his dining room while his wife remained in the adjoining living room. *Asher*, 2010 WL 4192883, at *1. However, while *Asher* might be an "easier" case, the facts of the present case as outlined above to not compel a different result.[19]

Nor does *Craighead*. Of course, case law from other circuits are not binding on this Court. *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004); *Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985). In any event, as noted above, in *Craighead*, among other reasons, the court found the defendant was in custody when he was questioned while in an unfinished storage room with a law enforcement officer blocking the door, 539 F.3d at 1086, and defendant's supervisor, who was brought to the defendant's home by law enforcement for his "emotional support," was not allowed

---

[19] The Court also does not rely on *Matcovich*, since the location of the questioning in that case, a boarding house, offers little guidance to the Court in this case.

AO 72A
(Rev.8/82)

to attend the questioning, *id.* at 1087, contributing to the court's conclusion that a reasonable person in Craighead's position would feel cut off from the outside world.

Accordingly, for all the above reasons, the undersigned concludes that Defendant was not in custody for purposes of *Miranda* and that as a result, his motion to suppress statements, [Doc. 14], should be **DENIED**.[20]

_____

[20]    Regardless of whether Defendant was in custody or not, the government must prove that his statements were voluntary. *Lall*, 607 F.3d at 1285. The parties do not address the voluntariness of the statements, which is a separate inquiry from Defendant's custodial status. *Yarborough*, 541 U.S. at 667-68.

The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g., Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d

46

## II.   *Defendant's Motion for Return of Seized Property, [Doc. 16]*:

At the evidentiary hearing, the parties announced that they were reaching an accommodation as to this motion.   T3-4.   As a result, the undersigned **RECOMMENDS** that the motion, Doc. 16], be **DENIED AS MOOT**.

---

at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).  Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

The Court concludes Defendant's statements were voluntary.  Although Defendant's educational level is not disclosed, his employment in computers for a large domestic company demonstrates his intelligence for voluntariness purposes.  Next, the total length of his detention was under one hour, which does not qualify as an exceedingly long interrogation.  While the subject matter of the interrogation was exceptionally serious since Defendant was being questioned about having sex with his daughter, and on at least one occasion, Westall criticized Defendant's answers as not appearing to be truthful, the nature and tone of the interrogation did not arise to the level where the Court can conclude that Defendant had no choice in answering Westall's questions.  Further, as noted in the text, the physical force against Defendant was limited to grabbing him outside and holding his hands behind him while the house was secured, and no physical touching of Defendant occurred during the questioning.  Finally, the record is silent as to any promises or inducements by the agents to get Defendant to talk and answer questions.

47

### III.   *Conclusion*

For all the above and foregoing reasons, the undersigned **RECOMMENDS** that Defendant's motion to suppress evidence, [Doc. 14], be **DENIED**, and that Defendant's motion for return of seized property, [Doc. 16], be **DENIED AS MOOT**.

The Court now has ruled on all pretrial matters referred to it and has not been advised of any impediments to the scheduling of a trial.  Accordingly, the case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this ___14th___ day of November, 2013.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

48